In the Matter of KENNETH O. SMITH, as Treasurer of New York Fire Insurance Rating Organization, Petitioner, against JULIUS S. WIKLER, as Superintendent of Insurance of the State of New York, et al., Respondents.

Third Department, March 30, 1960.

*Powers, Kaplan & Berger* (*George I. Gross, Abraham Kaplan* and *Richard Wolfe* of counsel), for petitioner.

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair, Samuel A. Hirshowitz* and *George K. Bernstein* of counsel), for Superintendent of Insurance, respondent.

*Tobin & O'Brien* (*W. Perry Epes* of counsel), for North America Companies and others, respondents.

*Lord, Day & Lord* (*Charles W. Merritt* and *Jack P. Jefferies* of counsel), for American Casualty Company of Reading, Pennsylvania, respondent.

*Davis Polk Wardwell Sunderland & Kiendl* for Chubb & Son, Inc., *amicus curiæ.*

*Aranow, Brodsky, Bohlinger, Einhorn & Dann* for National Association of Independent Insurers, *amicus curiæ.*

REYNOLDS, J.  This is a proceeding under article 78 of the Civil Practice Act brought by Kenneth O. Smith, as treasurer of the New York Fire Insurance Rating Organization hereafter referred to as NYFIRO to review a determination of the Superintendent of Insurance.  The respondent insurance companies who are subscribers to the rating services of NYFIRO for fire and extended coverage insurance filed independent rates with the Superintendent for a multiple peril insurance policy known as Commercial Property Coverage.

This policy is designed for retailers, wholesalers and jobbers of merchandise to cover personal property usual to the conduct of their business and is an all-risk policy covering the perils of fire, extended coverage, burglary and theft, water damage, transit and other miscellaneous perils.  This type of policy is the result of legislation in 1949 which permitted fire and marine companies to write casualty and surety insurance and vice versa (L. 1949, ch. 667), and the purpose of this legislation was to allow this type of "package policy" to give the policyholders broader coverage at a considerable savings.  NYFIRO also filed rates for such a policy.  These filings were accepted by the Department of Insurance to become effective on July 1, 1957 but after an objection was received from NYFIRO the effective date of all the filings was suspended.  The Superintendent then held that the independent filings of the respondent companies would have to be withdrawn since they were not for a new kind of insurance or for a class of risk or part or combination thereof.

The respondent companies requested a hearing and as a result the original decision was rescinded and it was held by the Superintendent that:  "the Commercial Property Coverage

policies are distinctly separate types of insurance contracts covering combinations of kinds of insurance and subdivisions or parts thereof for various classes of risks and that the petitioners may elect to exclude or withdraw such types of policies from their authorizations as subscribers to NYFIRO and to make such filings independently. I also conclude that under the provisions of Section 181(4) such petitioners may continue to subscribe to the rating services of NYFIRO for the regular standard forms of fire insurance and extended coverage insurance in respect to mercantile occupancy classes."

Petitioners contend that this policy does not provide a new kind of insurance but rather that it is a combination of kinds of insurance and therefore based on its interpretation of subdivision 4 of section 181 of the Insurance Law which makes the word " combination " referable only to class of risk, it maintains that an insurer may not file independent rates for this policy and at the same time subscribe to NYFIRO for its fire and extended coverage rates. The Superintendent claims that the word " combination " refers not only to " classes of risks " but also to " kinds " and " subdivision ". The basic contention raised by NYFIRO is that respondents' filings are not independent because they have not terminated their subscribership to the kinds of insurance and classes of risk embraced in the C. P. C. policy.

At this point it might be well to consider generally the relevant background concerning the problem. Article 8 of the Insurance Law of this State (§§ 180–189 inclusive), relating to fire and casualty rate regulation, was amended (L. 1948, ch. 618) to satisfy the requirements of the McCarran-Ferguson Act (U. S. Code, tit. 15, §§ 1011–1012). The purpose of the changes is set out in the 1948 Report of the Joint Legislative Committee on Insurance Rates and Regulations. (See N. Y. Legis. Doc., 1948, No. 46.) The McCarran-Ferguson Act, which followed the decision in *United States* v. *Underwriters Assn.* (322 U. S. 533 [1944]) and the recommendations of the All-Industry Committee (of Insurance Companies) and the National Association of Insurance Commissioners, declared a moratorium on the application of the Federal antitrust laws to the business of insurance until June 30, 1948. After that date these laws would apply only " to the extent that such business is not regulated by State law " (U. S. Code, tit. 15, § 1012). The aim of the numerous, carefully considered amendments to article 8 in New York — which were patterned generally after the Model Fire and Casualty Rate Regulatory Bill proposed by the National Association of Insurance Commissioners and the All-Industry

Committee — is summarized in the statement of legislative purpose in section 180, to wit: " The purpose of this article is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, unfairly discriminatory or otherwise unreasonable and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this article. Nothing in this article is intended (1) to prohibit or discourage reasonable competition, or (2) to prohibit or encourage except to the extent necessary to accomplish the aforementioned purpose, uniformity in insurance rates, rating systems, rating plans or practices. This article shall be liberally interpreted to carry into effect the provisions of this section."

In recommending the enactment of this statement of legislative purpose, the Joint Legislative Committee on Insurance Rates and Regulations stated: " As stated in the report of May 23, 1946 of the Subcommittee of the Committee on Rates and Rating Organizations of the National Association of Insurance Commissioners the purpose ' becomes clear when read in the light of the congressional debate preceding the enactment of U. S. Public Law 15, the reports of the various congressional committees in connection with that bill, particularly Report No. 143 of the House of Representatives dated February 13, 1945, and the law itself. These sources of material indicate quite plainly that Congress was willing to permit cooperative action, including price-fixing, in the insurance business on a state level providing such activity was regulated and at the same time was interested in seeing to it that reasonable competition was preserved. It was felt that the insertion of a purpose clause together with a provision calling for a liberal interpretation of the bill would serve as a guide for state administrators in interpreting and enforcing the new law '." (N. Y. Legis. Doc., 1948, No. 46, pp. 53–54.)

Thus it was the intent that the Superintendent of Insurance would independently exercise his judgment, within the mandate of the statute, in passing upon a rate filing submitted to him to the end that reasonable competition was preserved.

The filings here involved provide for rates composed of three principal rate components which are the fire rate, extended coverage rate and a loading for the " all other perils " hazards included in the coverage. The components for fire and extended coverage are based on the fire and extended coverage rates of NYFIRO and for which the respondent companies still subscribe. See subdivision 4 of section 181 of the Insurance Law which provides: " Each rating organization shall * * * permit

any authorized insurer, not admitted to membership, to become a subscriber to its rating services * * * for any kind of insurance or subdivision or class of risk or a part or combination thereof written by fire or marine insurers * * *." It seems clear that Commercial Property Coverage is a combination of kinds, subdivisions and classes of risks of insurance and is a type of insurance contract which the statute fixes as a unit of subscribership for which an insurer may subscribe to a rating organization or file independently, and the Superintendent could determine in connection with this policy that an insurer who does file independently may still subscribe to a rating organization for its rates for fire and extended coverage which, although they are a part of the broad multiple peril policy, are in themselves units of subscribership. As the testimony at the hearing indicated and the Superintendent pointed out these rating plans provide for indivisible rates which in effect means that no specific portion of the final premium is attributable to any one portion of the coverage. In sum, the determination of the Superintendent herein has authorized competitive filings within the express purpose and language of the Insurance Law, and his construction of the statute involved has reasonable basis and warrant on this record.

The determination should be confirmed, with $50 costs.

BERGAN, P. J., COON, GIBSON and HERLIHY, JJ., concur.

Determination confirmed, with $50 costs.